United States District Court
District of Massachusetts

Criminal No. 03-10383-RGS

**United States,**

v.

**Jose Rafael Santiago**

**Memorandum In Support Of Motion To Suppress Evidence**

**Issues Presented**

1.  Whether the defendant is entitled to suppression of evidence found in a car he was operating where the police stopped him outside of their jurisdiction.

2.  Whether the defendant is entitled to suppression of evidence found in a car he was operating where the police lacked probable cause to believe that evidence of a crime would be found therein.

**Anticipated Facts**

For purposes of this motion, the defendant assumes that the government will present evidence with the recitation of facts set forth in the Affidavit of DEA Agent Mark G. Tully filed in support of his application for a warrant to search the residence of one

1

of the codefendants. The relevant portions of that affidavit are as follows:

> 4. On Friday, November 7, 2003, I submitted an affidavit in support of an application to conduct electronic surveillance on a prepaid T-Mobile cellular telephone with the number (617) 818-0545. While T-Mobile subscriber records did not list any name or address for the subscriber of the telephone, the prior investigation in which I participated revealed that it was used frequently by a male known only as "Ramon" to have conversations with various other drug traffickers. The wiretap application was approved by United States District Judge Douglas P. Woodlock on November 7, 2003 and the wiretap was activated at approximately 1:05 p.m. on that date.
>
> 5. At 1:19 p.m. on November 7, DEA monitors intercepted an incoming call to "Ramon" from a man who identified himself as "Mingo" and who stated that "the Mexicans" were coming tomorrow. "Mingo" further stated that it was a "sure thing" and that it was "definitely" happening. At one point, "Ramon" asked how much was coming and "Mingo" replied "seis manos" (six hands). Based on my training and experience, as well as my involvement in this investigation, I believe that this was a reference to thirty (30) kilograms of cocaine (five fingers on a hand times six). "Ramon" indicated that he was supposed to be traveling to the Dominican Republic the next day (Saturday, November 8) but that he would be canceling the trip. As the conversation progressed, "Ramon" stated that "my security blanket her is the parking," that Nancy is "cool," and that everything was "all set up here." "Ramon" also indicated that "we need to put the car in a place where Nancy knows where it is" and that they would go to "take everything out" and

2

"pick up." As the conversation progressed, "Ramon" and "Mingo" discussed who they would give "it" to, specifically mentioning people named "Manolo," "Alexander," and "Candelo," and "Mingo" indicated that the Mexicans would call him when it was here. Based on my training and experience, and my involvement in this investigation, I believe that "Ramon" and "Mingo" were discussing a plan to obtain thirty (30) kilograms of cocaine from Mexican sources of supply and to distribute the cocaine to workers or distributors in Massachusetts.

6. As set forth more fully below, "Ramon" was subsequently identified as Julio Franco, residing in a townhouse apartment at 11 Kings Hill Drive in Lynn, and "Mingo" was subsequently identified as Domingo Vega, residing in an apartment at 106 Hyde Park Avenue in the Hyde Park section of Boston. Based on my database checks and further intercepted calls, "Nancy" was identified as Nancy Rios Franco, Julio Franco's wife. Records maintained by the NCIC Interstate Identification Index indicate that Julio Franco has used an alias of "Ramon Mercedes" with the same social security number but a different date of birth.

7. At 1:38 p.m. on November 7, DEA monitors intercepted another lengthy conversation between Franco and Vega in which Franco stated that he was going to get a "parking space" (i.e., a storage facility) for a car, that he had a car in a particular location, and that "nobody has seen me touching the car or anything like that." Franco also stated that "Raffi has been staying here for a few days" and they discussed how much Franco had paid Raffi in the past "when we did the heavy stuff." DEA monitors intercepted further calls on November 7 in which Franco indicated that he was collecting money from different persons and that something was

3

coming in. Based on my training and experience, and my involvement in this investigation, I believe that Franco was putting together a large sum of money to pay for the thirty kilograms of cocaine and that the money he had was being secreted inside an automobile owned or controlled by him. During the investigation, "Raffi" was identified as Jose Rafael Santiago, residing in an apartment at 476 Metropolitan Avenue in the Roslindale section of Boston.

8.   On November 7, DEA monitors intercepted calls indicating that Franco and his wife used a telephone at 11 Kings Hill Drive in Lynn. That afternoon, DEA agents set up surveillance at that address and observed a woman subsequently identified as Nancy Rios Franco arrive at this address with a man subsequently identified as "Raffi" (Santiago) in a 1994 blue Audi registered to Santiago. That night, "Ramon" (Julio Franco) arrived at the address in a 1996 black Dodge Intrepid, bearing a Massachusetts registration number of 82 WA 04, and registered to Julio Franco at 11 Kings Hill Drive in Lynn.

9.   On Saturday, November 8, 2003, DEA monitors intercepted various calls in which persons contacted "Ramon" (Julio Franco) concerning when it would be arriving. "Ramon" also had conversations with "Mingo" (Vega) asking him when it would be arriving, what they would do when it arrived, and how much they would sell it for when it arrived. "Ramon" also called a travel agency, identified himself as Julio Franco, and canceled his flight to the Dominican Republic. DEA monitors also intercepted calls in which "Ramon" instructed his wife to obtain a storage facility and she indicated that she obtained one. During one conversation, "Ramon" (Julio Franco) and "Mingo" (Vega) were discussing the Mexicans, specifically what was taking so long, and "Mingo"

4

stated that a van with "52 passengers" (52 kilograms of cocaine) was on its way. Based on my training and experience, and my involvement in this investigation, I believe that "Ramon" (Julio Franco) was waiting for the cocaine to arrive and that he intended to store the cocaine inside an automobile, which would be stored inside a storage facility obtained by his wife.

10. On the evening of Sunday, November 9, 2003, DEA surveillance agents observed "Ramon" (Julio Franco) traveling from 11 Kings Hill Drive in Lynn to an automobile show at the Expo Center in Boston and then back to Lynn. As this was occurring, at 6:42 p.m., DEA monitors intercepted a further call from "Mingo" (Vega), who asked where "Raffi" (Santiago) was and who stated that "these people are ready." After "Ramon" asked what he needed to do, "Mingo" stated: "get the money and come right down." "Ramon" stated that he would get to the house. After hanging up with "Mingo" (Vega), "Ramon" called "Raffi" (Santiago). As he was doing this, "Ramon" stated to a person who accompanied him to the auto show that "we have to give almost eight hundred up front." "Raffi" stated that he was in Worcester. "Ramon" instructed "Raffi" to leave right away "and come to my house." I believe that "Ramon" (Julio Franco) was indicating that he had to pay almost $800,000 for the cocaine and that he was instructing "Raffi" (Santiago) to leave Worcester to pick up the cocaine.

11. After hanging up with "Raffi" (Santiago), "Ramon" (Julio Franco) called "Mingo" (Vega) and stated that "Raffi" was still in Worcester. "Mingo" stated that "we can't be carrying shit" (i.e. "Ramon" and "Mingo") and that "the stuff" (i.e., the cocaine) was already there. "Ramon" and "Mingo" jointly decided to have "Raffi" travel directly from Worcester to Providence, Rhode Island rather than go to

5

"Ramon's" residence in Lynn. In a subsequent call, "Mingo" informed "Ramon" that he spoke to "Raffi" and told him to go directly to Providence. "Ramon" stated that he already had "five plus" (i.e., $500,000 in the "casuela" (trunk or trap) and that he could not fit anything else in there. "Ramon" and "Mingo" jointly decided that they would have to make two trips and that they would leave some of the money in Boston.

12. After these conversations, DEA surveillance agents observed "Ramon" (Julio Franco) arrive at 11 Kings Hill Drive in Lynn. "Ramon" was observed entering a 1996 black Volkswagen Jetta, bearing a Massachusetts registration number of 83 CY 06 and registered to a female resident of Roxbury, and driving away from Lynn toward Boston. DEA monitors intercepted further conversations indicating that "Ramon" and "Mingo" (Vega) met each other in Boston and that "Mingo" had taken the Volkswagen Jetta from "Ramon" and was driving it to Providence, Rhode Island.

13. On the night of November 9, a uniformed officer with the Massachusetts State Police stopped the Volkswagen Jetta as it was being driven southbound on Interstate Route 95 near the Massachusetts-Rhode Island state line. During this stop, the trooper identified the driver as Domingo Vega. The vehicle contained a male passenger identified as Mark Osorio, residing at 42 Harrison Archway in Boston. After this stop, the Volkswagen Jetta continued southbound on Route 95 toward Providence.

14. The Volkswagen Jetta was followed to the area of Van Buren Street in Providence, where it was parked. Both the driver and passenger were observed exiting from the vehicle and walking into an alley between two residences. Shortly thereafter, other persons were observed coming

6

out of the alley and engaging in what appeared to be counter surveillance. At that time, to fire engines, with their horns and sirens sounding, came down the street and stopped in this area. Shortly thereafter, the DEA surveillance agents observed a male emerge from the alley, walk around the block, enter the Volkswagen Jetta, and drive away. As this was occurring, "Raffi" (Santiago) called "Ramon" (Julio Franco) and stated that he had met with "Mingo" (Vega) but that "something weird" happened and "we had to leave." "Raffi" added that "it seems Mingo was being followed" and that "Mingo didn't like it so we left . . . he told me to forget about it and leave." "Raffi" indicated that "we didn't pick up the clothes" (i.e., the cocaine) and that he was driving the other car (i.e., the Volkswagen Jetta) back to Massachusetts.

15. The Volkswagen Jetta was followed as it was driven out of Providence, onto Route 95 northbound, and then onto Route 146 toward Worcester. At 10:08 p.m., DEA monitors intercepted a call from "Ramon" to "Mingo," who stated that the area had been full of "policemen" and that "we got out of there." "Mingo" also related that he had been stopped on his way over there (i.e., on his way down to Providence), and that he had sent "Raffi" up there "with the car," and that "I have his car." Shortly after this conversation on November 9, the Volkswagen Jetta was stopped on Route 146 in Lincoln, Rhode Island. The driver was identified as Jose Raphael Santiago, a/k/a "Raffi." A search of the Volkswagen Jetta led to the recovery of a large sum of cash, believed to be in excess of $500,000, in a secret compartment beneath the rear passenger seat. As this was occurring, "Ramon" attempted to call "Raffi's" telephone but there was no answer.

The defendant expects to present additional evidence regarding the initial stop of the Volkswagen Jetta on its way to Rhode Island by a Massachusetts state trooper. Specifically, at the time of the stop, the trooper used his flashlight to look into the entire motor vehicle. At that time, he observed no evidence of any criminal activity.

As noted above, after the Volkswagen left Providence, it was stopped in Rhode Island by a police officer from Massachusetts. A DEA agent then approached the car. After realizing that the stop took place in Rhode Island, the DEA agent made a call on a cellular phone. The defendant over heard him saying, "I didn't know we didn't have jurisdiction." He then said to the Massachusetts police officer, "We fucked up, but I am not letting him go. We will all take the blame for it." They then searched the car.

I.  **The Defendant Is Entitled To Suppression Of Evidence Found In A Car He Was Operating Where The Police Stopped Him Outside Of Their Jurisdiction**

Initially, the defendant contends that he is entitled to suppression of the evidence found during the second search of the Volkswagen. Whether or not the police had probable cause to believe a crime had been committed, the police officer who stopped the defendant's car clearly was outside of his jurisdiction. Absent exigent circumstances, a stop or arrested taking place outside an officer's jurisdiction violates the Fourth Amendment. *See United States v. Green*, 178 F.3d 1099, 1107 (10th Cir. 1999) (Fourth Amendment permits warrantless arrests only where officer has probable cause and makes the arrest within his jurisdiction or under exigent circumstances); *Ross v. Neff*, 905 F.2d 1349, 1353-1354 (10th Cir. 1990) (same); *United States v. Medearis*, 236 F.Supp.2d 977, 983 (D.S.D. 2002) (same); *Horn v. City of Seat Pleasant, Md.*, 57 F.Supp.2d 219, 223 (D.Md. 1999) ("We have implied that an arrest made outside of the arresting officer's jurisdiction violates the Fourth Amendment to the Constitution"); *United States v. Foster*, 566 F.Supp. 1403, 1412 (D.D.C. 1983) ("The concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by

a police officer. When a law enforcement official acts beyond his or her jurisdiction, the resulting deprivation of liberty is just as unreasonable as an arrest without probable cause."). In this case, there were no exigent circumstances justifying a stop of the Volkswagen in Rhode Island. The police were not in hot pursuit of a fleeing felon. In fact, as will be discussed more fully below, they clearly knew that no drug transaction had taken place in Providence. In these circumstances, the stop of the defendant's car violated the defendant's rights under the Fourth Amendment, and he is entitled to suppression of the fruits of the unlawful stop and search. *See Immigration and Naturalization Service v. Lopez-Mendoza*, 468 U.S. 1032, 1040-1041 (1984).

**II.     The Defendant Is Entitled To Suppression Of Evidence Found In A Car He Was Operating Where The Police Lacked Probable Cause To Believe That Evidence Of A Crime Would Be Found Therein**

Assuming the government survives the challenge to the police conduct set forth above, the record discloses another fatal flaw in the stop and search. Specifically, the police lacked probable cause to believe that evidence of a crime would be found in the motor vehicle operated by the defendant.

"To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a

crime will be found in a particular place.'" *United States v. Burton*, 288 F.3d 91, 103 (3rd Cir. 2002), quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). It is not enough to establish that the defendant had engaged or was about to engage in criminal activity. The government must connect that activity to the particular location searched. *Id.*; *United States v. Genao*, 281 F.3d 305, 308 (1st Cir. 2002); *United States v. Baldyga*, 233 F.3d 674, 683 (1st Cir. 2000); *Jacobs v. City of Chicago*, 215 F.3d 758, 770 (7th Cir. 2000); *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997).

In this case, Agent Tully's affidavit describes a number of telephone conversations intercepted pursuant to a wiretap warrant issued by this court. He describes the parties' use of jargon, and he offers his interpretation of that jargon, ultimately coming up with some astronomical drug quantities. The defendant questions those interpretations. While Agent Tully purported to base his conclusions on his training and experience, the interpretation of such ambiguous expressions is notoriously difficult, and his conclusions ultimately were little more than guesswork. *See United States v. Dukagjini*, 326 F.3d 45, 52 (2nd Cir. 2003) (jargon used by drug dealers is often deliberately ambiguous and difficult to interpret); *United States v. Peoples*, 250 F.3d 630, 640-642 (8th Cir. 2001).

Even assuming the accuracy of those interpretations, the stop and search was fatally flawed. Although they believed that the Volkswagen contained a large amount of money—so much that the alleged conspirators planned two trips—as noted above, the trooper who stopped that car in Massachusetts examined its interior saw nothing incriminating. Thereafter, law enforcement personnel followed the car and monitored the telephone calls of parties in the two cars. Based on their observations and the telephone calls, they knew that no drug transaction took place in Providence. Thus, at the time of the stop, they knew it contained no drugs, and they had no grounds to believe it contained money or other evidence of a crime. In the absence of probable cause to believe that evidence would be found in the car, the police lacked grounds to stop and search it. *Id.*; *United States v. Genao*, 281 F.3d at 308; *United States v. Baldyga*, 233 F.3d at 683; *Jacobs v. City of Chicago*, 215 F.3d at 770. The defendant is entitled to suppression of the evidence found during the unlawful search. *United States v. Scott*, 270 F.3d 30, 40 (1st Cir. 2001). *See Murray v. United States*, 487 U.S. 533, 536-537 (1988); *Wong Sun v. United States*, 371 U.S. 471, 484-487 (1963).

### III. Conclusion

Based on the authorities cited and the reasons aforesaid, the defendant requests that his motion to suppress be allowed.

Respectfully submitted,

Jose Rafael Santiago,
*By his attorney,*

Joseph J. Machera
B.B.O. # 311160
220 Beach Street
Revere, Massachusetts 02151
(781) 289-8646