UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 03-10383-RGS

UNITED STATES OF AMERICA

v.

JULIO FRANCO, JOSE RAFAEL SANTIAGO and
DOMINGO VEGA

MEMORANDUM AND ORDER ON
DEFENDANTS SANTIAGO'S AND VEGA'S MOTIONS TO SUPPRESS

December 17, 2004

STEARNS, D.J.

There are two motions to suppress. The first arises out of the November 9, 2003 stop of a Volkswagen Jetta driven by defendant Jose Santiago in Lincoln, Rhode Island, by agents of a Drug Enforcement Administration (DEA) Task Force, including Massachusetts State Trooper Kevin O'Neil. Some $529,000 in cash and a "very explicit" drug ledger were seized from a hidden trap under the rear seat. Santiago alleges that the stop was illegal because (1) the officer initiating the stop was outside his territorial jurisdiction and (2) the search of the vehicle was not in any event supported by probable cause.[1] Defendant Domingo Vega moves separately to suppress evidence seized from

---

[1] The first ground of Santiago's motion to suppress can be summarily disposed of as it is based on the misapprehension that the stop was initiated by Trooper O'Neil. While O'Neil is concededly a Massachusetts State Police officer, and while the stop concededly occurred in Rhode Island, and while the authority of a Massachusetts officer to make an arrest is ordinarily limited to the territorial jurisdiction of the Commonwealth, see Commonwealth v. Grise, 398 Mass. 247, 249 (1986), I fully credit the testimony of DEA Group Supervisor Robert Robertson that the stop was initiated by DEA Special Agent Keith Leighton. Moreover, Trooper O'Neil (whose role in the stop was to block any forward movement of the Jetta), was a duly deputized DEA Task Force agent with extraterritorial powers of search and arrest. See 21 U.S.C. § 878(a).

a 1994 Audi he was driving when stopped by a Massachusetts State Trooper in Mansfield, Massachusetts, also on November 9, 2003, again on grounds that the officers lacked probable cause to search the vehicle. He also moves to suppress any incriminating statements made to police in the aftermath of the stop.[2]

## FACTS

The following facts are stipulated by the parties and are taken verbatim from their July 16, 2004 submission [Docket # 40].

1. DEA Special Agent Mark Tully has the general qualifications, training and experience, as set forth in his Complaint Affidavit, dated November 10, 2003 (Complaint Affidavit).

2. Agent Tully was involved in the present investigation since early October of 2003.

3. Agent Tully would have testified as to the intercepted calls and his interpretations of them as set forth in his Complaint Affidavit and Tully would have testified as to the government's opposition to the motions to suppress, dated June 1, 2004. The parties agree that Tully would have testified as such at a suppression hearing and that these statements from the affidavits are incorporated into this Stipulation.

4. On November 7, 2003, Agent Tully submitted an application for a warrant to conduct electronic surveillance on a pre-paid mobile cellular telephone, which though not listed to any specific individual, was frequently used by a male known as "Ramon" and other drug dealers. "Ramon" was subsequently identified as defendant Julio Franco, and

---

[2]Neither the government nor Vega identify any incriminating statements Vega is alleged to have made. As Vega does not pursue the point in his brief, I deem the issue to be waived.

Julio Franco was subsequently determined to be an alias for Ramon Mercedes Ortiz. The application was approved by Judge Woodlock and activated on the same date.

5. On the same day, shortly after activating the device, in the second call monitored, the caller identified himself as "Mingo" and stated that the "Mexicans" were coming tomorrow, and when asked how much was coming stated "six hands."

6. "Mingo" was subsequently identified as Domingo Vega of Hyde Park, Massachusetts.

7. Later on the same day, another conversation between "Ramon" and "Mingo" was monitored, which Agent Tully would testify was narcotics related, as more fully set forth in his Complaint Affidavit, Paragraph 7.

8. Further calls were monitored as set forth more fully in the Complaint Affidavit, Paragraph 7. For example, "Ramon" states that "nobody has seen me touching the car or anything like that" and later "Mingo" states "Yes" you have to be careful." and "I want to bring Nancy [to] not make anybody suspicious." Based on intercepted calls until that point, on November 7, 2003, surveillance was begun in Lynn at 11 Kings Hill Drive and vehicles were observed including a blue Audi 1994 model, utilized by Jose Raphael Santiago and a black Dodge Intrepid 1996 model.

9. On November 8, 2003, several calls were monitored, which Agent Tully interpreted as narcotic related conversation, as set forth more fully in his Complaint Affidavit, Paragraph 8.

10. On Sunday, November 9, 2003, several more calls were monitored, which Agent Tully would testify were narcotics related, as set forth in his Complaint Affidavit,

Paragraphs 9-11. For example, "Mingo" stated that "these people are ready" and told "Ramon" to "get the money and come right down."

11. Based on information gained from the intercepted calls as set forth in Agent Tully's Complaint Affidavit, surveillance was also conducted on "Ramon" who was observed entering a black Volkswagen and driving towards Boston from Lynn.

12. Based on the information gained from the intercepted calls, surveillance agents, including Massachusetts State Trooper Jim Bazzinotti was looking for the black Volkswagen. At approximately 9:00 P.M., Trooper Bazzinotti stopped a black Volkswagen with defendant Vega ("Mingo") and Mark Osorio on Southbound Rte. 95 hear the Rhode Island line. However, the Trooper did not know this was the correct target vehicle until checking with DEA. Defendant Vega was operating the vehicle. Mark Osorio was located in the front passenger seat. Osorio has not been indicted in this case.

13. The Trooper stated that Vega had made an illegal lane change. The Trooper had the parties produce identification, used his flashlight to look at what was in plain view in the vehicle, found nothing, and released the parties.

14. Law enforcement then surveilled the Volkswagen to Providence and calls continued to be monitored as set forth more fully in the Tully Complaint Affidavit, Paragraphs 14-15. For example, "Raffi" (defendant Jose Raphael Santiago) called "Ramon" (defendant Julio Franco) and "Raffi" stated that he had met with "Mingo" (Vega) and that "something weird" had happened and "we had to leave." In a call between "Ramon" and "Mingo," [Vega] stated that the area was full of "policemen" and that "we got out of there."

4

15. Based on the intercepted calls, including those set forth in the Tully Complaint Affidavit, the Volkswagen was stopped in Lincoln, Rhode Island. The Volkswagen was operated by Santiago ("Raffi"). Based on the information learned during these intercepted calls, Santiago was arrested. A quantity of cash was found in the automobile during a search incident to arrest. This Volkswagen was the same vehicle that had been stopped approximately an hour earlier.

16. Defendant Vega and Mark Osorio were stopped and arrested on Rte. 95 Northbound in the blue 1994 Audi in Mansfield, Massachusetts based on the information learned during the intercepted calls. A search of the vehicle revealed no contraband or cash. Items, including what Agent Tully would testify were drug ledgers, were seized from Mr. Vega's person. The Audi was found to have been properly registered and not stolen.

## CONCLUSIONS OF LAW

Based on the stipulated facts, as supplemented by the incorporated Tully affidavit,[3] I conclude that police had probable cause to believe that evidence of drug-related crimes would be found in the Volkswagen Jetta, as well as probable cause to stop and arrest both Santiago and Vega. The same standard of probable cause governs both searches and arrests. Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or by "a preponderance" of the evidence. United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979). Probable cause is concerned with probabilities, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949).

---

[3] The Tully affidavit is attached as Exhibit A to the Government's June 1, 2004 memorandum and is quoted at length in Santiago's May 3, 2004 memorandum.

Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime, it does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983) (*plurality opinion*).

Vehicle searches have been long recognized as an exception to the Fourth Amendment's warrant equipment. Carroll v. United States, 267 U.S. 132, 158-159 (1925). An officer who has probable cause to believe that a lawfully stopped vehicle contains evidence of a crime may without a warrant search any area of the vehicle or its contents that might conceal the object of the search. United States v. Ross, 456 U.S. 798, 825 (1982). Probable cause to search the Jetta turns on the issue of whether the agents had a reasonable basis for believing that money intended to be used to purchase cocaine was being transported in the car. The DEA had developed sufficient information that "Ramon" (Julio Franco) was in league with Columbia drug exporters, to persuade a Judge of the United States District Court to authorize a wiretap on a telephone used by "Ramon."[4] Agent Tully's stipulated testimony regarding the results of the wiretap, as set out in his Complaint Affidavit at paragraphs 5-11, relates facts warranting the agents in the belief: (1) that Franco, Santiago and Vega were co-conspirators in a major drug trafficking venture; (2) that as of November 7, 2003, the defendants were expecting the imminent delivery of at least thirty kilograms of cocaine from their Columbian suppliers; (3) that the defendants were in the process of assembling a substantial sum of money (in excess of

---

[4]The legality of the wiretap order is not challenged.

$500,000) to pay for the delivery; (4) that the money was to be transported in a specially adapted Volkswagen Jetta to the exchange; and (5) that the exchange was to take place in Providence, Rhode Island, on the evening of November 9, 2003. This information, gleaned from the intercepted conversations of the three defendants, and corroborated by DEA surveillance of the defendants' movements, provided more than sufficient probable cause to believe that money connected to drugs would be found in the Jetta.

The same probable cause that justified the search of the Jetta and the arrest of Santiago also justified the stop of the Audi and the arrest of Vega approximately an hour later in Mansfield, Massachusetts. Incident to that arrest, police were permitted to search the passenger compartment of the Audi (with or without probable cause), as well as any open or closed containers found in the compartment. New York v. Belton, 453 U.S. 454, 460-461 & n.4 (1981).[5]

The fact that the finding of probable cause is based on Agent Tully's opinion that the jargon used by "Ramon," "Mingo," and "Raffi" constituted coded references to drug activity does not detract from the finding. Drug dealers are aware of the use by law enforcement

---

[5] Vega had been stopped two hours before the arrest (while driving the Jetta) by Massachusetts Trooper Bozzinotti, who was apparently acting on instructions from DEA surveillance agents. After confirming Vega's identity, Bozzinotti permitted him to continue on his way to Providence. In the absence of evidence to the contrary, I will assume that the reason that Bozzinotti gave for the stop (an illegal lane change) was (as Vega argues) pretextual and that the true purpose of the stop was to confirm the identities of the occupants of the Jetta. Even so, this is of no practical consequence. Bozzinotti could have arrested Vega at 9:00 p.m. on November 9, 2003, as probable cause for an arrest existed within the collective knowledge of the Task Force officers. See United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002). Moreover, even if one assumes a Fourth Amendment violation, it is doubtful that a defendant's identity (Vega's was already known to the DEA) would be a suppressible fruit of an unlawful stop. Immigration and Naturalization Service v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984).

7

of electronic surveillance to detect and amass evidence of illegal drug trafficking and, as a counter-measure, commonly resort to coded language. As a result, federal courts permit law enforcement officers, if they are shown to possess sufficient training and experience, to give expert testimony interpreting coded references to drug dealing. See, e.g., United States v. Castiello, 915 F.2d 1, 3 (1st Cir. 1990); United States v. Kusek, 844 F.2d 942, 949 (2d Cir. 1988); United States v. Echeverri, 982 F.2d 675, 680 (1st Cir. 1993) ("inscrutable" drug ledger); United States v. Duarte, 950 F.2d 1255, 1260-1261 (7th Cir. 1991) (cryptic "drug notes"); United States v. Boissoneault, 926 F.2d 230, 232-233 (2d Cir. 1991) (jargon and accouterments).

## ORDER

For the foregoing reasons, the motions to suppress are DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE